## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 21-CR-509 (TSC)** |
| v. | : | |
| | : | |
| ANTONY VO, | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Antony Vo, to 11 months of incarceration, which is the midpoint of the Guidelines range, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Antony Vo, who is 31 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Vo was convicted at trial of violating: 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count One); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four). The government's sentencing recommendation is supported by (1) the defendant's complete lack of acceptance of responsibility for his crimes on January 6, (2) his lack of respect for the rule of law, as reflected in his criminal history and conduct during the trial, and (3) his continued use of social media to publicly dispute his guilt and the findings of this Court.

The defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Vo's crime support a sentence of 11 months of imprisonment.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol contained in the Statement of Facts. ECF No. 1-1.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Vo's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Vo traveled by automobile from his home in Bloomington, Indiana, to Washington D.C., with his mother and others to attend former President Trump's "Stop the Steal" rally at the Ellipse.

After leaving the rally, Vo walked down Pennsylvania Avenue toward the Capitol with a crowd of other people. When he arrived on Capitol grounds, despite numerous fences, signs, and barricades surrounding the perimeter, Vo joined the growing mob and entered the restricted area on the building's west side. As he proceeded toward the Capitol building, Vo used his cellphone to take photographs and videos of the chaos around him. As early as 2:15 p.m., Vo photographed rioters swarming the Capitol building in front of him, and continued to take photographs and videos as he drew closer to the Capitol. He also photographed rioters using a barricade to climb onto a balustrade, and he watched as they ripped a white tarpaulin from the scaffolding that had been erected in preparation for the upcoming inaugural ceremonies. *See Figure 1.*



*Figure 1: A photo Vo captured on his cellphone showing rioters having torn down a tarp and climbing a fence used as a makeshift ladder (circled in green). (Trial Exhibit 432.)*

Undeterred by the chaos, Vo continued forward and proceeded to walk through the scaffolding and up a set of stairs toward the Capitol as rioters scaled the outside of the scaffolding around him. As Vo passed one rioter, the rioter screamed, "They're gonna eat you. They're gonna cheat you. Do not stop." *See Figure 2.*



*Figure 2: A rioter screams in Vo's face as Vo (circled in red) enters the scaffolding to climb the stairs toward the Capitol. (Screenshot from Trial Exhibit 603.1 at 0:14.)*

Vo nevertheless continued upward with the mob, passing clouds of pepper spray and the sounds of the mob's battle with police on the Lower West Terrace.

 

*Figures 3 and 4: Vo (circled in red) ascends the staircase, inside the scaffolding. (Trial Exhibits 604.1 and 604.2)*

4

Once he reached the Upper West Terrace, Vo joined the mob outside the Senate Wing Doors. There, he took a video of a rioter climbing the side of the Capitol building as the mob below cheered that rioter on. *See Figure 5.*



*Figure 5: A screenshot from a video Vo captured on his cellphone of a rioter scaling the exterior of the Capitol building, then raising a fist in the air. (Trial Exhibit 405.1.)*

Vo eventually entered the Capitol building through the Upper West Terrace Door, which is a double fire door armed with an alarm that serves as an emergency exit, not a public entrance. Prior to Vo's entrance, Metropolitan Police officers had formed a police line just outside the Upper West Terrace Door to try and keep rioters out of the Capitol building, but the officers fell back in the face of the growing mob. Then, minutes before Vo's entry into the Capitol, rioters already inside the building exited through Upper West Terrace Door, setting off a piercing alarm that continued to sound as long as the door remained open. Seeing the Upper West Terrace Door open, rioters outside on the Upper West Terrace ran to the Door and held it open, allowing other rioters to stream in. While a few outmanned Capitol Police officers still attempted to block the entrance for several minutes, they were overwhelmed by the size of the crowd, which chanted "Let us in!"

As Vo approached the Upper West Terrace Door, he photographed the multitude of rioters streaming inside. He also captured images of a rioter standing on the banister adjacent to the door, and other rioters waving flags from a balcony ledge above the door.  *See* Figure 6.



*Figure 6: An image from Vo's cellphone showing rioters streaming into the Capitol through the Upper West Terrace door, as one rioter stands on an adjacent banister and others occupy a balcony above. (Trial Exhibit 439.)*

On his way inside, Vo also passed an impromptu barricade the mob had constructed between themselves and a nearby line of police officers, which they made from bike rack fencing and scaffolding poles. *See Figure 7.*



*Figure 7: Vo (circled in red) approaches the Upper West Terrace door; the barricade (circled in green) to his right, just feet away, separates the rioters from a line of police officers. (Trial Exhibit 628.1.)*

Vo entered the Capitol building at 2:38 p.m. As he walked through the Upper West Terrace Door, he held one of the double doors open and looked directly at a sign on the inside of the door which read: "Emergency Exit Only. Push Until Alarm Sounds (3 Seconds). Door Will Unlock in 15 Seconds." *See* Trial Exhibit 610.1; *Figure 8*. Vo also walked past multiple law enforcement officers who had been overwhelmed by the force of the mob, and proceeded up a set of stairs into the Rotunda on the second floor of the Capitol.



*Figure 8: Vo (circled in red) looks at the "Emergency Exit Only" sign on the Upper West Terrace Door. (Trial Exhibit 302.2.)*

Vo spent approximately the next 20 minutes in the Rotunda and Statuary Hall. While inside, he spoke with other rioters and took photographs. At one point, he raised his fist and yelled "Freedom!" while standing among the raucous mob. *See Figures 9 and 10.*





*Figures 9 and 10: Vo (circled in red) screaming while in the Rotunda. (Trial Exhibit 623.1, and a zoomed-in screenshot of the same video.)*

At another point, Vo handed his phone to a fellow rioter, who then passed an American flag to Vo, and standing nearly in the center of the Rotunda, the other rioter snapped a picture of Vo standing in a defiant pose raising the flag above his head. *See Figure 11.*



*Figure 11: Vo, surrounded by rioters, in the center of the Rotunda, holds an American flag overhead. (Trial Exhibit 444.)*

At 3:02 p.m., police reinforcements arrived and began entering the Rotunda. Only once those officers started directing the rioters, including Vo, toward a nearby exit, did Vo proceed to

leave the building. Vo left the Capitol through the East Rotunda Doors at 3:05 p.m., having been in the building for approximately 27 minutes. He then remained in the restricted area on the East Plaza of the Capitol where he continued to take cellphone pictures of himself and the mob.

*Vo's Social Media Messages and Text Messages After January 6*

Almost immediately after leaving the building, Vo began boasting about his participation in storming the Capitol. At 3:18 p.m., less than 20 minutes after he exited the building, Vo sent a text message to a friend bragging that he "[s]tormed the fuck out of [the Capitol] with my mom lol." (Trial Exhibit 460A.)

Vo continued to brag about his participation throughout the evening in social media messages, saying that "my mom and I stormed it lol" (Trial Ex. 503A), and "my mom and I got to storm the Capitol" (Trial Ex. 505A). He showed complete disregard for the Capitol Police officers who tried to protect the Capitol, saying, "yeah they stood down and retreated after we clearly outnumbered them." (Trial Ex. 502A). Vo sent the same photo of himself and his mother, standing amid the mob in the center of the Rotunda, to at least five different people via social media messages (Trial Exs. 501A, 502A, 503A, 504A, 505A). *See Figure 12.*



*Figure 12: The image Vo sent at least five times to friends on social media.*

But Vo was not merely proud of his presence in the Capitol building, he understood and savored the broader implications of the January 6 mob's attack on the Capitol, saying in a text

message that "Wow apparently we stopped the vote count for a bit" (Trial Ex. 461A), and in a social media message, "My mom and I helped stopped the vote count for a bit" (Trial Ex. 501A). Vo relished the fact that his intrusion had been instrumental in disrupting the peaceful transition of power and the democratic process.

Even participating in stopping the vote count was not enough for Vo. He fantasized about returning to the Capitol after January 6, saying in a text message that it would be "so easy to storm the Capitol with arms," and "They had it easy today" (Trial Ex. 461A).

### Vo's Violation of Release Conditions During Trial

During his trial, Vo violated the conditions of his pretrial release by visiting the Freedom Corner near the Washington D.C. jail. On the last day of trial, Vo's Probation Officer reported to the Court that Vo had spent three nights at the Freedom Corner, which the Court found to be in violation of the condition forbidding Vo to stay away from Washington D.C. except for court business. The Court admonished Vo, saying, "that's not part of his attendance in court" and "that's not why he's here in Washington, D.C." Tr. Sept. 22, 2023 at 1090. While the Court chose not to detain Vo because of the violation, the Court did impose on him a curfew of 8:00 p.m. to 7:00 a.m. while he remained in Washington D.C. *Id.* at 1092.

### Vo's Comments Since His Conviction

Since his conviction, Vo has continued to publicly dispute his guilt and exhibited a total lack of respect for the rule of law. In his Twitter bio header, he calls himself a "J6 wrongful convict." *See Figure 13.* As recently as January 20, 2024, in responding to another post, he continued to challenge the jury and this Court, saying "there was zero jury of peers and 100% a kangaroo court." *See Figure 14.*

10



*Figures 13 and 14: Vo's Twitter bio header, in which he continues to dispute the jury's findings, and a recent post in which he calls the Court a "kangaroo court."*

Further, on October 23, 2023, approximately a month after his conviction, Vo appeared as part of a "J6 Panel" on the internet talk show "Diamond and Silk Chit Chat Live."[2] *See Figure 15.* During the interview, he spoke at length about his conduct on January 6, but accepted no responsibility for his actions that day. He disputed the jury's finding that he knew he was not allowed to enter the Capitol, saying "I thought that I was allowed to go in." He also misrepresented the evidence presented during his trial, saying that no signs told him the area was off limits: "By the time that I got to the grounds, to the Capitol doors, the video all showed all that was taken away before I even got there."

---

[2] Diamond and Silk, *"J6 PANEL" Shane Jenkins, Sara McAbee, Anthony Vo, Eric Braden, Captain Gabriel Garcia* (Oct. 23, 2023), https://rumble.com/v3ra4a1-j6-panel-shane-jenkins-sara-mcabee-anthony-vo-eric-braden-captain-gabriel-g.html.



*Figure 15: Vo, appearing after his conviction on the internet talk show "Diamond and Silk Chit Chat Live," where he continued to dispute his guilt.*

On March 12, 2024, Vo gave an interview on *Conservative Daily Podcast, David Clements with Special Guest Antony Vo*. During the podcast, Vo—contradicting the evidence from trial and outright lying—claimed that rioters were at the Capitol on January 6 for a "scheduled event," that there "was no violence" at the Capitol that day, and that the officers at the Upper West Terrace Door stood aside for rioters to "uphold our Constitutional rights to petition for our grievances."[3] As he knew well, this wasn't true, because the evidence at trial showed that Vo passed clouds of tear gas, the mob on the Lower West Plaza, and a line of police officers on his way into the Capitol.

*The Charges and Convictions*

On September 22, 2023, Vo was convicted following a jury trial on all four Counts of the Information, including violations of: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds (Count One); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (Disorderly

---

[3] Conservative Daily Podcast, *David Clements with Special Guest Antony Vo*, at 25:50 – 27:26 (Mar. 12, 2024)   https://www.listennotes.com/podcasts/conservative-daily/david-clements-with-special-8lvx_rRnkw6/#episode.

Conduct in a Capitol Building) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing, in a Capitol Building) (Count Four).

### III.    Statutory Penalties

Vo now faces sentencing on Counts One through Four.

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR as to both Counts One and Two, as set forth below:

Count One (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Total Adjusted Offense Level | 6 |

The government also agrees with the Sentencing Guidelines calculation set forth in the

Count Two (18 U.S.C. § 1752(a)(2)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Total Adjusted Offense Level | 10 |

*See* PSR at ¶¶ 33-50.

The offenses that Vo violated under 40 U.S.C. § 5104(e)(2)(D) and (G), Counts Three and Four, are Class B misdemeanors; therefore, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

The U.S. Probation Office assessed, and the government agrees, that Vo has not clearly demonstrated acceptance of responsibility for the offenses of conviction and is not eligible for any reduction for acceptance of responsibility. PSR at ¶ 48.

The U.S. Probation Office calculated Vo's criminal history as Category II. PSR at ¶ 55. Taking into account the government's guidelines calculation for Count Two, Vo's total adjusted offense level is 10, and his corresponding Guidelines imprisonment range is eight to fourteen months.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 11 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-CR-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Vo's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Vo, the absence of violent or destructive acts is not a mitigating factor. Had Vo engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Vo's case is his lack of respect for the rule of law. His pervading lack of respect was evident on January 6 when he ignored repeated warning signs that he should not enter the Capitol building. It is also evidenced by his continued pattern of criminal violations, described further below. Moreover, Vo exhibited his lack of respect for the rule of law during the trial in this matter when he violated the conditions of his pretrial release by visiting the Freedom Corner near the Washington D.C. jail, for which the Court admonished him and imposed a curfew on him.

Vo's complete lack of remorse for his actions on January 6 should also animate the Court's decision regarding his sentence. Within minutes of leaving the Capitol building on January 6, Vo used text messages and social media to brag about intimidating police officers, halting the vote count, and storming the building. His lack of contrition continued after his trial when he repeatedly used social media to dispute his guilt, where he called himself a "J6 wrongful convict" and called this Court a "kangaroo court."  Vo has never accepted responsibility for his actions on that day.

Accordingly, the nature and the circumstances of Vo's offense establish the clear need for a sentence of incarceration.

### B.  Vo's History and Characteristics

As set forth in the PSR, Vo's criminal history consists of three relevant convictions. PSR at ¶¶ 52-55.

On May 15, 2017, Vo was arrested while driving through Kimble County, Texas, with "multiple bottles and packages of marijuana," a number of firearms, and a significant amount of ammunition. Vo pleaded guilty to Possession of Marijuana, and two firearm offenses were dismissed. He was sentenced to six months of community supervision. PSR at ¶ 52.

On August 21, 2019, in Buena Vista, Virginia, Vo was charged with Possession of Marijuana, which was later amended to Unauthorized Possession of Paraphernalia. He was fined $300. PSR at ¶ 53.

On June 24, 2020, in Nelson County, Virginia, Vo was charged with Possession of a Schedule I/II Drug, which was amended to Accessory After the Fact (Felony) at the time of his sentencing on September 15, 2020. He was sentenced to 12 months of jail, all suspended, a $500 fine, and ordered to be on good behavior for the 12-month period of his suspended sentence. The sentencing occurred in September 2020, approximately four months before the events of January 6, 2021. It does not appear that the suspended sentence was affected by the defendant's federal charges stemming from his conduct on January 6. PSR at ¶ 54.[4]

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

---

[4] The recent amendment to U.S.S.G. § 4A1.3 Application Note 3, which states that a downward departure from the defendant's criminal history category may be warranted if the defendant has criminal history points associated with simple marijuana possession, is not applicable here. Not only did Mr. Vo's 2017 offense involve numerous firearms being found in his vehicle, but his 2020 sentence was a felony charge. Moreover, Mr. Vo committed the instant January 6-related offenses a mere four months after his 2020 sentence was imposed, a suspended sentence whose terms he clearly violated by storming the Capitol building. And, as the Background to the Application Notes states, a departure is not warranted where there is a likelihood of recidivism, a likelihood which Vo presents, as illustrated by texts regarding storming the Capitol in the future with firearms. Thus, a departure is not warranted here.

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-CR-233-ABJ, Tr. June 9, 2023 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. As Judge Nichols has said, "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 21-CR-041-CJN, Tr. Oct. 13, 2021 at 37.

General deterrence is an important consideration because many of the rioters—including this defendant—intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, as discussed above, Vo's criminal history reveals that Vo does not respect the law. *See* Section IX(B) *supra.* Even after avoiding a jail sentence in his September 2020 trial and being ordered to obey the laws and keep the peace, Vo committed additional crimes at the Capitol just four months later. Vo's experience with the criminal justice system did not deter him from committing more serious crimes on January 6.

Second, on September 22, 2023, during this trial, Vo violated his terms of pre-trial release by attending a rally outside the D.C. jail in support of January 6 defendants. The Court then modified his conditions of release and put Vo on curfew and limited his movements while in the District Columbia. *See* Minute Entry Sep. 22, 2023.

Third, Vo has never accepted responsibility for his actions on January 6, even after the jury returned guilty verdicts on all four charges. Instead, he has continued to lie about what happened on January 6, 2021, minimize his conduct on that day, and blame the Court for his conviction.

The Court should view any remorse Vo expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 21-CR-054-TSC, Tr. Oct. 4, 2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions." ).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Vo based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Vo was found guilty of all four counts in the Superseding Information. Counts One and Two, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), are Class A misdemeanors. 18 U.S.C. § 3559. Counts Three and Four, Disorderly or Disruptive Conduct on the Grounds or in the Buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating and Picketing in Any Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), are Class B misdemeanors. Although the Sentencing Guidelines apply only to Counts One and Two, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to all four counts.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-CR-314-TNM, Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines." (statement of Judge McFadden)). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31-FYP, Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021." (statement of Judge Pan)).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Russell Alford*, 21-CR-263-TSC, this Court sentenced the defendant to 12 months of incarceration followed by 12 months of supervised release after he was convicted at trial of the same four charges as Vo. Like Vo, Alford entered the Capitol building after walking past a number of signs saying the Capitol building and grounds were restricted. He also celebrated his participation on social media, and much like Vo, Alford showed no remorse for his actions. Unlike Vo, however, the Court found that Alford testified falsely at trial. While Vo did not testify during his trial, it is clear that Vo, through his out-of-court statements, similarly lacks respect for

this Court and an understanding of the gravity of what happened on January 6. When it sentenced Alford, this Court stated that, "[t]here wouldn't have been a mob without you," a perspective that applies with equal strength to Vo. Thus, a sentence here of 11 months of imprisonment is proper.

In another case similar to this one, *United States v. Stacy Wade Hager*, 21-CR-381-TSC, the defendant was convicted of the same four charges following a bench trial and this Court sentenced him to seven months of incarceration. Like Vo, Hager was in a position to observe the violence occurring on January 6, but nevertheless made his way deeper into the Capitol to disrupt the Congressional proceedings anyway. Hager also continued, after his conviction, to espouse conspiracy theories that January 6 was a hoax and that police invited rioters into the Capitol. While Hager did not testify at trial and the Court did not find the obstruction it found in the *Alford* case, Hager also expressed no remorse for his actions on January 6 until his sentencing, when his allocution was conflicted. Unlike Vo, Hager had zero criminal history points, which at least in part explains why he received a sentence lower than the eleven months that is appropriate here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Vo was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

22

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Vo to pay $500 in restitution for his convictions on Counts One, Two, Three, and Four. This amount fairly reflects Vo's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Antony Vo to 11 months of incarceration, which is the midpoint of the Guidelines range, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Vo's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Eric Boylan*
       Eric Boylan

Texas Bar No. 24105519
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Tel: (202) 815-8608
Email: eric.boylan@usdoj.gov


*/s/ Lynnett M. Wagner* _____
LYNNETT M. WAGNER
Nebraska Bar No. 21606
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Tel: (402) 661-3700
Email: lynnett.m.wagner@usdoj.gov